MEMORANDUM OF DECISION
This is an action for the termination of the parental rights of a minor child, Lauren R., born September 9, 1985. Evidence offered at trial, interpreted in the light of the record in this court supports the following factual chronology.
The parents of the child are Bonnie S., now 40 years of age, and a father Richard R. who is more properly described as the male biological parent. He has never been involved in the life of the child. His present wife and family are unaware of the existence of Lauren and he has signed a consent to terminate his parental rights. The petitioner is the Commissioner of the Department of Children and Families (DCF) who has amended her petition to indicate the consent of the male biological parent and DCF is proceeding against the mother, Bonnie S. The grounds for the petition are that the child has previously been adjudicated neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. General Statutes 17a-112 (c)(3)(A); that the mother has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the child; General Statutes Sec. 17a-112 (c)(3)(D); and that the child has been denied, by reason of an act of commission or omission, the care, guidance or control necessary for his physical, educational, or emotional well-being. General Statutes Sec. 17a-112 (c)(3)(C). The action for termination of parental rights was filed in the Superior Court for Juvenile Matters in CT Page 9429 Hartford on January 30, 1996. Counsel was appointed for the minor child, the mother has had counsel throughout the proceedings and was ably represented in the contested hearing on the termination of her parental rights. The court finds that it has jurisdiction. The parties were properly served and no action is pending in any other court affecting the custody of this child.
I. PROCEDURAL HISTORY
1. The Police Investigation
On April 5, 1993 DCF sought and obtained an order of temporary custody of the minor child, Lauren, and filed a petition alleging neglect of the child. The petition indicated that the child had been sexually abused; that the child had been denied proper care and attention, physically and emotionally; and that the child had been subjected to circumstances or associations injurious to her well-being. At about the same time as DCF was filing the neglect petition, the East Hartford Police were investigating and seeking a warrant for the arrest of the mother for the violation of Sec. 53-21 of the General Statutes, Risk of Injury to a minor (respondent's Exhibit F).
The affidavit in support of the arrest warrant application filed by Officer Jodi Boebert, an officer assigned to the Juvenile Section of the Criminal Investigation Division of the East Hartford Police Department indicates that on October 26, 1992 the investigator received a report from an individual at a Hartford hospital. The report stated that Bonnie S. was a co-worker and had told the reporter that "she felt her boyfriend had sexually assaulted her six year old daughter." The following day Officer Boebert and a DCF worker (formerly DCYS) interviewed Lauren at her school. Lauren indicated that she had talked to her mother about her private area hurting and her mother told her to take a bath. Lauren did not disclose any sexual abuse. She stated that her mother's boyfriend, Jeff, watches her at times when her mother is at work and he sometimes hurts her when they do tricks. It was unclear to Officer Boebert what the tricks were. Lauren indicated that she did not feel safe with Jeff but it was unclear why.
On October 27, 1992 Officer Boebert interviewed Bonnie at her home. Bonnie denied ever telling anyone that her boyfriend Jeff sexually assaulted her daughter. Officer Boebert asked Bonnie at that time "for Jeff's complete name and where he lived but she CT Page 9430 refused to give out any information. She stated she would give my name to Jeff and have him contact me." Further:
 That on 11-03-92 the undersigned investigator and Georgette Katin of DCYS returned to Bonnie S.'s home to request that she have her daughter examined. At this time Bonnie was very rude and stated if we wanted to "have her daughter's legs spread and have her vagina checked" that she would do that, but that if the exam was negative she wanted to be left alone. Bonnie stated that she would take her daughter to Kaiser. Bonnie still refused to give the undersigned any information about Jeff and stated she did not want him to know what we were questioning her daughter about him because she did not want to scare him off. Bonnie also informed us she was pregnant with Jeff's child.
 That on 11-13-92 the undersigned investigator received a sworn statement from (the co-worker) stating that Bonnie S. did tell her and two other co-workers that she believed Jeff has sexually assaulted her daughter. (She) stated that all tried to tell Bonnie that she had to report this but Bonnie did not want to and she stated she told her daughter not to talk about it anymore.
Thereafter Officer Boebert received a medical report from Kaiser which report was unclear but could not confirm any sexual abuse. A complete internal examination was not done. Since there was insufficient evidence to pursue the case, the East Hartford Police Dept. closed their investigation.
Approximately five months later on March 25, 1993 Officer Boebert received another complaint of sexual assault involving Bonnie's boyfriend Jeff. Wendy, an 11 year old friend of Lauren had disclosed to her parents sexual contact by Jeff. Wendy stated that she was very concerned for her friend Lauren who was then seven years of age. Wendy indicated to the police that Lauren told her "not to worry about it, its happened to me too, I was scared at first but then I got used to it". The 11 year old victim stated that Jeff inserted his finger in her private part and asked her if she wanted to go to bed with him. She also stated that Jeff told her that Bonnie knows everything and not to worry. The 11 year old victim stated she has not seen Jeff since.
Thereafter on March 31, 1993 Officer Boebert and Georgette Katin of DCYS again interviewed Lauren at her school. Lauren at that time disclosed that Jeff has hurt her and she told her mother and her older sister. She indicated that her mother told her not to talk to anyone about it. Lauren indicated that her CT Page 9431 mother's boyfriend Jeff "licked her private part and made her pee". She further indicated that Jeff inserted his finger in her buttocks and put his private part on her private part. Lauren indicated that this occurred in her mother's bedroom while her mother was at work on the third shift and while her brothers and sisters were sleeping. She indicated that this happened more than once for about a week.
On April 1, 1993 Officer Boebert interviewed Bonnie S. at her home. Bonnie again was uncooperative and stated she did not believe her daughter or her daughter's friend. She stated Jeff did not do anything and she refused to give out Jeff's name (Respondent's Exhibit F "Exhibit A").
2. Court Activity
On April 5, 1993 an order of temporary custody, awarding custody of Lauren to the Commissioner of Department of Children and Families was entered (Mulcahy, J.). On April 13, 1993 Bonnie was arrested for risk of injury (Respondent's Exhibit G). On April 16, 1993 a family violence protective order was entered preventing Bonnie from any unsupervised contact with Lauren (T. Sullivan, J.). On October 21, 1993 on a plea of nolo contendere the court (Foley, J.) entered a finding of neglect on the petition as pleaded. The child was committed for twelve months to the Commissioner of DCF.
On May 23, 1994 on a motion to revoke the commitment the court, (Foley, J.) revoked the order of commitment and entered an order of protective supervision for a period of one year. Thereafter on June 15, 1994 at the Superior Court, GA 12 in Manchester, the court, (Barry, J.) entered a protective order allowing Bonnie no contact with Lauren whatsoever. This occurred following an arrest for multiple violations of the earlier protective order. On June 27, 1994 at the Superior Court for Juvenile Matters in Hartford the court, (Foley, J.) upon motion by DCF modified the prior order of protective supervision and committed Lauren back to the Commissioner of DCF. On July 5, 1994 at the Superior Court, Part A Criminal in Hartford, the court, (Miano, J.) continued the no contact order in effect preventing Bonnie from any contact with Lauren. On July 28, 1994 at the J.D. in Hartford, Bonnie filed a motion to dissolve or modify the protective order. After an extended hearing on August 12, 1994 the court, (Espinosa, J.) denied the motion to dissolve and the motion to modify the protective order (Respondent's Exhibit G). CT Page 9432
During that hearing of August 12, 1994 Judge Espinosa found the following:
(Respondent's Exhibit O, pages 60-64).
 The court notes that, as the state has said, the allegations against the defendant are very serious. She faces substantial . . . a substantial period of incarceration in this case. The allegations are, as the state stated, that she not only didn't believe her daughter when her daughter told her that her boyfriend was sexually molesting her, but she also threatened her with punishment if she told anyone. The victim was very concerned that if the authorities told her mother that she had disclosed this abuse she would be punished, that she would be grounded. She was very concerned about her mother's reaction and indeed made a statement that she did not feel safe in her mother's home. . . .
 At the time — before that Miss (sic) had been again arrested for — and charged with tampering with a witness, making harassing and threatening comments to her co-worker who had reported the abuse to the authorities. It is alleged that the defendant mentioned the sexual abuse by her boyfriend to her co-workers at the hospital, and one of those co-workers — well, they all urged her to report it. She refused and indeed one of the co-workers reported it to the authorities and that was one of the ways that the cases came to light — the abuse case came to light.
 It is alleged that the witness who reported the abuse to the authorities has been the subject of harassment and threats, threats to kill her and that it was — she has been arrested for that. Indeed, that witness has had to move on several occasions because of the nature and severity of the threats allegedly made by the defendant.
Thereafter, Judge Espinosa found that the protective order which the mother was attempting to modify arose out of first, her failure to allegedly protect her daughter from sexual abuse, secondly, from allegedly harassing and threatening a witness in the sexual abuse case and in the risk of injury to a minor case and then further, violating the protective orders "boldly and flauntingly disregarding an order of the court that she knew that she should not have any contact with the victim". Thereafter Judge Espinosa denied the motion to modify and to vacate the prior protective orders.
On August 22, 1994 the mother, through her attorney, Jon CT Page 9433 Schonhorn filed a motion for review to the Appellate Court (Respondent's Exhibit F). On August 25, 1994 the mother through her attorney filed "Defendant's Emergency Application for Certification to Appeal" to the Connecticut Supreme Court. On October 14, 1994 in an action entitled Bonnie S. v. Carmen Espinosa, Judge and James Thomas as State's Attorney for Hartford filed a motion for preliminary injunction and verified complaint in the United States District Court for Connecticut.
On May 19, 1995 this case was dismissed by the District Court for Connecticut (Alfred V. Covello, J.) and thereafter an appeal was filed in the United States Court of Appeals for the 2nd Circuit (No. 95-7591, Respondent's Exhibit J). While it is not clear what happened to this appeal, it apparently was not successful.
3. The Termination Petition
On January 30, 1996 DCF filed the presently pending petition for the termination of parental rights of Lauren's biological parents. The position of DCF is that the mother has failed to rehabilitate herself and that certain of her acts constitute acts of commission or omission that have denied Lauren the care, guidance and control necessary for her physical, educational, moral or emotional well being. Specifically, DCF's position is that by her failure to address her own issues; her on-going disbelief of her daughter's allegations of molestation and her continued support of the perpetrator, her parental rights should be terminated.
One of the case workers testified at some length that in a three hour visit with Bonnie in May of 1994 the caseworker indicated to Bonnie that her support for Lauren was absolutely crucial. The lack of support for Lauren is another trauma to the child. Bonnie's response to this was that she had been sexually abused herself by foster parents and it didn't bother her. Bonnie's position was that Lauren bad fabricated the story and that the allegations were all lies.
DCF urged her to seek and obtain individual counseling to deal with her own problems and to attend a sexual abuse course for survivors of sexual abuse. Bonnie did attend eight counseling sessions in July and August of 1995, nearly three years after Lauren's abuse occurred. She indicated to the caseworker she only attended because her attorney instructed her to do so. She told CT Page 9434 the caseworker that attending the classes didn't change anything and wasn't helping her.
Because of the no-contact Family Violence Protective order issued in the criminal proceedings there was no visitation for Bonnie with the child from May 1994 to July 1995. In a supervised visit permitted in July of 1995, the DCF worker reported that it was a very tense visit, a lot of silence and mother and daughter didn't even touch, it was "a very, very tense meeting". Bonnie told the child that "she was very skinny, she didn't like her hair style, that she looked like a foster child and that she had a lot of ugly freckles that she inherited from her mother". The social worker told Bonnie after the visit that criticizing Lauren would not be helpful to the relationship indeed, it would be destructive of the relationship. When the social worker urged her to obtain individual counseling Bonnie's response was a denial of any need for such services.
One of the social workers, Kasa Kowalyck, took over the case in April in 1994 and had the case for 18 months until October 1995, some three years after the sexual abuse episode. During the time that Miss Kowalyck had the case Bonnie never admitted to her that sexual abuse had occurred.
The most favorable report that was prepared encouraging to the mother was that of Farah A. Ibrahim, a clinical psychologist who was seeing Lauren and her mother in family therapy. (Respondent's Exhibit A, February 8, 1994) Dr. Ibrahim indicated that Lauren should eventually be reunited with her mother, that they desperately missed each other and that progress had been made in therapy in that Lauren has had an opportunity to be heard by her mother. Dr. Ibrahim indicated that she would like to continue to work with Lauren individually to restore her trust in herself and aid in her healing. Dr. Ibrahim concluded with respect to Bonnie "I believe that she could benefit from individual therapy for the anger she feels for the past and what she has experienced in the past year since she still has relatively young children she could benefit from a course on parenting and appropriate protection of her children. This is not an abusive woman, she has coped remarkably well in spite of her own history. However, currently she is stuck and needs supportive, caring therapeutic intervention, not more confrontation. I am quite pleased with your efforts (DCF) to support both Bonnie and Lauren." CT Page 9435
Following that report on February 8, 1994 the parties appeared before the Juvenile Court (Foley, J.) on March 3, 1994 (Petitioner's Exhibit 7). The court suspended family therapy pursuant to Dr. Ibrahim's report. Because the mother was so vigorously opposed to individual therapy the court did not order her to undergo individual counseling but "strongly encouraged it". Thereafter Bonnie attended one counseling session with a therapist who indicated to her that she would not continue to see Bonnie because Bonnie was there only at the insistance of DCF and that Bonnie was not self-motivated. Accordingly, she concluded, Bonnie would not benefit from counseling.
On January 31, 1994 DCF social worker Beth Lanolina wrote an empathetic and understanding letter to Bonnie after their first meeting 10 days earlier. In the letter the social worker stated:
 "I understand that you are outraged with Lauren's placement in foster care. I have also read your case record so I am familiar with your history. Based on what I read, you certainly have a right to be angry about what happened to you in the past. However, I feel you are reacting to your past as well as to Lauren's situation." (Petitioner's Exhibit #20)
4. Mother's History
Bonnie S. was born on Valentine's day 1957. She was the seventh of eight children. Her mother died when Bonnie was four years old. During Bonnie's testimony she provided the following information to the court.
In 1963 when Bonnie was six years old she went into foster care after her three older sisters disclosed sexual abuse by her father. The father was subsequently sentenced to prison for molesting his daughters and the children went into placement with DCYS. Bonnie and her sister Florence first went to live with a black family. She could not remember how long she stayed there or why she left but she does recall it was not very long. Thereafter she went for her second placement to a distant relative who lived in Hartford. Bonnie was 7 or 8 years old. "I was there a year as a kid, you don't wipe your butt well, they put a diaper on me and dragged me down the street in front of my friends". The foster mother got pregnant, Bonnie didn't fit in, and they moved her. Her third placement was in South Windsor. Bonnie indicated that at that foster placement they had a daughter that always picked on her. The foster parents wanted to keep her back in school and CT Page 9436 they made fun of her and told her she was stupid. "But they were nice people". Bonnie indicated that she was there for about a year. The foster father would take her over his knee and spank her. Bonnie stopped talking to him. She would not communicate to anyone when the foster father was present. She was removed from that foster home.
She was next moved to an orphanage in New Britain where she spent her third grade year. Bonnie indicated that there were a lot of neat kids at the orphanage and there was excitement going on all of the time. Her recollection of the orphanage was that at Thanksgiving she was sick and she threw up. The nun told her to go upstairs and pull down her pants and wait for the nun to come up and spank her.
Her next placement was with a foster family where the foster mother was psychotic according to Bonnie. "She had problems, she would scream out on the top of her lungs, `I'm going to kill you' standing in a corner yelling at nobody. She would hit me with a belt for no reason. My sister Laura came to the house. If she wasn't beating me she was beating Laura. They took my sister out of the home, now I'm taking all the beatings again". Bonnie thought of herself as the foster mother's slave, washing dirty dishes. They were an older couple and Bonnie hated them. Bonnie was fearful of telling her social worker because she didn't trust DCYS. When Bonnie was in the fifth grade, returning from a doctor's office visit, she confided in the social worker and thereafter she was placed with a family who had three brothers and one sister. Bonnie was going into the sixth grade. It was her sixth placement.
The other children taunted Bonnie because Bonnie indicated that she had freckles, was skinny and had a big nose. The sister in the family who was fat used to molest Bonnie. Bonnie indicated they slept in the same bed and the girl would fondle her. Bonnie indicated she got fed up with that, she told the foster mother and thereafter the foster mother contacted the agency and had her removed for telling such stories about her daughter.
Thereafter she went to live with a family with one of her sisters. This family moved from Connecticut to Maine. They were an older couple and retired. Bonnie recalls that there was an evening when they had company over at the house and that Bonnie did the dishes and apparently one blue dish was missing. They made Bonnie stand there for hours until she figured out where the CT Page 9437 blue dish was. Later on the older man started molesting Bonnie. Bonnie indicated that she and her sister could not tolerate it there, that they would not survive another summer with these people and so she wrote a letter to her social worker in Hartford. She indicated that when the social worker came to rescue them they left all of their personal effects behind; ". . . their clothes, pictures and everything; we got in the car and just wanted to get out of there".
Bonnie's eighth placement was for a couple of weeks with a family in Coventry. Then she went to live with her older sister Florence who is approximately six years older than Bonnie. Florence was living in Pennsylvania. She was married and had a baby son. Bonnie ended up taking care of the son while Florence slept days and worked nights and her husband worked days. Bonnie indicates when she wasn't in school she was baby-sitting. Her sister complained that Bonnie was smoking. Bonnie indicated that she didn't have any money to smoke and that all she did was baby-sit. She subsequently returned to Connecticut and was placed in the State Receiving Home in the eighth grade.
It was at the State receiving home when she thirteen years of age that she saw her father again. Bonnie was thrilled to see him. He had just gotten married. She was hoping that he would take her home. Even though he had molested her sisters he had not molested Bonnie and Bonnie had forgiven him saying that he received his punishment going to jail. The State would not approve of her father who was a convicted child molester and she stayed in foster care. She stayed in the State Receiving Home for eight months and then was transferred to her 11th placement which was at the Gray Lodge.
Bonnie described Gray Lodge as a place for teen age children who were not problem children and were able to do alright in school. During her time at the Gray Lodge she went to Hartford High School. In March of 1974 she moved out to her own apartment. She was seventeen years of age and just left. At about the same time Bonnie became pregnant by Jose M.
Bonnie had three children by Jose M. and after the children were all born, Bonnie and Jose were married in 1980. From 1974 until about 1984 Bonnie was on State Assistance. During that period of time Jose ran her life. He was physically abusive to her. He beat her, made her sick, busted her head, broke the bridge of her nose and ran around with other women, drank CT Page 9438 excessively, did drugs, committed larcenies and did "a lot of coke". During that period they lived many places in the Hartford area, including Charter Oak Terrace, Oak Street, Broad Street, Zion Street and lived for a short period of time in Puerto Rico. In 1984 Bonnie indicated that Jose was so strung out on coke he had "become such a burden on us I wouldn't let him come back". Bonnie was employed at a grocery chain store as a produce clerk. She also worked at a Hartford hospital supporting her three children by Jose.
While working at the grocery store in 1984 Bonnie met Richard R. Bonnie was going through her divorce from Jose. Bonnie began a relationship with Richard R. who was then engaged to another woman whom he later married. Bonnie report having one intimate contact after Richard's marriage to his present wife, at which time Lauren was conceived. Lauren was born in September of 1985. Mr. R. never told his wife or family about the existence of Lauren. In 1993 he filed a petition in the East Hartford Probate Court seeking to terminate his parental rights. That petition was dismissed and he has subsequently filed in this court a consent to terminate his parental rights. He claims to have never seen the child and while Lauren has a biological male parent she has never had a true father figure.
It was in January of 1986 that Bonnie took a second job at a hospital in Hartford working in various positions, beginning as a dietary aid, a transportation aid, a nurses aid and then a cardiac secretary. She has been working third shift since 1987. In January 1988 Bonnie took her four children, three by Jose and Lauren, and moved to East Hartford. She continued working two jobs until 1992 when she no longer worked at the grocery chain store.
Bonnie worked the 11 PM to 7 AM shift, 5 days a week. She also worked at a second Hartford hospital every other weekend that she had off from her first job. She received virtually no child support payments from the fathers of any of her children. When Bonnie set up her first household she had a girl by the name of Carmen who also worked in the produce department to live with her and her children. Carmen however got married and moved out. Thereafter a man by the name of Ray moved in with Bonnie.
Ray was an alcoholic. He worked at the grocery store as well. He had been living in a truck and Bonnie allowed him to move in with her family. He stayed until 1991 when Bonnie "kicked him CT Page 9439 out" because of his alcoholic blackouts. He was very verbally abusive to Bonnie during the periods of his intoxication. Her children urged her to kick him out.
At about this same time Bonnie had a relationship with a man by the name of Peter who was a meat cutter at the grocery store. Her children never met Peter.
5. The Child Molestation
In 1991 or 1992 Bonnie met Jeff L. His parents lived across the street at one time from Bonnie. Bonnie's work schedule was such that on Wednesdays her schedule at the grocery store and at the hospital permitted her to have the day off. Jeff would come over around 2 o'clock in the afternoon. Bonnie indicated that the children didn't mind Jeff coming over; he didn't live with them. He didn't work steady so he would play in the afternoon with the kids. He would fix their bikes, he didn't do anything for a living. He went through different jobs. Bonnie indicates that he
was a drinker! He was an alcoholic who could drink twice as much as Ray. He held his liquor very well, according to Bonnie, and he came over to the house for one reason and one reason only — sex. Bonnie described Jeff's visits as "my adult entertainment."
In October 1992 Lauren, who had just turned 7 years of age, reported to her mother and to her older sister Jennifer that Jeff had touched her and fondled her private parts. Bonnie was very distressed. She couldn't tell whether to believe Lauren or not. She indicates no one saw anything and that Lauren couldn't be certain of the date and would change her story. A second episode occurred on the Wednesday before Halloween, 1992. Lauren had called up her friend Wendy who was older than Lauren. Wendy came over to spend the night. Bonnie described the events of the evening as follows: "It was my night off. In the evening I always go for a nap at 4 PM and sleep in the early evening. Wendy, Lauren and Julio (one of her sons by Jose), were all in the living room. I went in to take a nap. I woke up and strangely the house was quiet. Sh__! What's going on, I said. I wasn't used to the quietness. I got out and opened the door and Lauren and Wendy were fully clothed on the sofa. Wendy on the left, Lauren on Jeff's right. The kids jumped up and ran to the stairs giggling. I went to the kitchen. I made some excuse. Jeff came in and had a look of surprise. He said he had his hand in their pants. He told me he had fondled their clitoris. I said, "What the f___ are you doing?" I was in shock, I was angry, he said "I didn't hurt CT Page 9440 them", I said "you were just doing that?" he said "I'm sorry" I couldn't even believe he would tell me. It was so unreal. I was pregnant with his child, six or seven weeks."
Bonnie said that the girls had gone upstairs and were calling him to have him come up and tell them a Halloween story. He went up and the children were all over him, hanging on his shoulder. Bonnie indicated she was very confused by them showing an interest in him given what he had just done.
Bonnie indicted that the next day Jeff denied that he even said that. Bonnie indicates she decided not to have him come over any more. She told the children not to allow him in the house any more. Bonnie reports that she continued to see him at his mother's house in an adjacent town. Since Jeff didn't work much, she would go up there to his mother's house once or twice a week. "I told Jeff I thought it was best not to come around when Lauren was present. . . it was no skin off his a__ that he didn't come around." Bonnie said that he would always call before he came anyway and after this I would just go to see him when he called. He never made an attempt to come over, he never even wanted to come over, according to Bonnie.
At the very end of October 1992 Office Jodi Boebert and DCYS Investigator Georgette Katin came over to Bonnie's house. Bonnie said that she knew DCYS would yank Lauren out of the home and "I didn't want her to experience anything I experienced in their lovely foster homes. So I denied it" Bonnie later said "who do you trust, the police? They want to arrest you. DCF? they want to take your kid." Bonnie refused to give Jeff's last name or address.
That same evening Jeff came over to the house. Bonnie indicates he had a gun. He didn't threaten her and Bonnie described it as a nice handgun. She gave him the number of the police. She said that she told Jeff to call the police, that this was a hot issue and everybody was complaining about it on TV. Bonnie indicated that she wanted her child to know his father. She told Jeff not to worry that she wasn't going to tell them about him. "I wanted Jeff to trust me", she said. "Don't come around here anymore."
In March of 1993 some five months later, Wendy's parents called the police to say that Wendy had recently disclosed that she had been sexually abused at Bonnie's home by Jeff. The police CT Page 9441 and DCF questioned Lauren at school. Bonnie admits that she told Lauren that if Lauren tells them that Jeff molested her that DCF would take her away from us. Bonnie's attitude was that what had happened to Lauren was not as severe as what had happened to her in foster care. She told Lauren that she would get over it.
Bonnie reports that DCF and the police told her that if Bonnie didn't give Jeff's name and address that Lauren would be taken from her. Bonnie indicated that she didn't want them to take Lauren but she knew that Lauren would be safer. "It was good and bad. Lauren would be safer and Jeff would know he could trust me, he wouldn't come back and take all our lives. I was protecting my boyfriend to me I looked at it that I was protecting my family."
On April 1, 1993 Officer Boebert, Sergeant Simmons and Georgette Katin made an unannounced visit to the home of Bonnie S. They informed Bonnie of a disclosure made by Lauren regarding Jeff to which Bonnie responded by shouting, "bullsh__, this is bullsh__" Georgette Katin advised Bonnie that now two children were alleging that Jeff had sexual contact with them to which Bonnie again replied, "bullsh__". Georgette asked Bonnie if she was saying that the children were lying to which Bonnie replied, "yes". Lauren was removed from the home on that date by virtue of a 96 hour hold.
Jeff left the state of Connecticut during the first week of April 1993. Bonnie indicates that she did not know where he was going but it was OK with her. Thirteen days later, on April 13, 1993, an arrest warrant was issued for Bonnie charging her with risk of injury to a minor child in violation of Sec. 53-21 of the General Statutes. In July of 1993 Jeff's child was born to Bonnie and she named the child with the last name of Jeff.
Bonnie subsequently was represented by counsel at the criminal proceedings in Hartford and made application for accelerated rehabilitation. The attorney believed that if Bonnie disclosed Jeff's name that should would more likely receive accelerated rehabilitation, so she disclosed Jeff's last name to her attorney. She was denied accelerated rehabilitation and those criminal charges remain outstanding to this date.
In January of 1994 Jeff was arrested in Los Angeles, California. He was arrested because "he skipped out on a DWI so they kept him in California". After be served his time in CT Page 9442 California he was returned to Connecticut to stand trial for risk of injury charges which are presently pending.
When Jeff came back to Connecticut, Bonnie visited him five days a week and brought his new born infant son every time she went to the prison. He was released on bond in February of 1995. Bonnie continued her relationship with Jeff and subsequently a second child was conceived and born in December, 1995. It was Bonnie's sixth child. Neither pregnancy by Jeff was planned. As of the time of trial in March of 1997 Bonnie continues her relationship with Jeff whose is now ". . . involved with three or four other women." Bonnie brings the two children to see Jeff whenever he wants. She usually goes up to his house. She reports that he is never alone with his two children and she only takes them there if he has not been using alcohol.
When questioned about her continuing sexual relationship with Jeff, Bonnie becomes very defensive, "I don't call this a relationship at all. You sound like there is some kind of feelings between us. There aren't". Jeff does not support his children. Jeff continues to provide her "adult entertainment".
When asked at the end of her cross-examination at trial whether she was angry at Jeff she responded, "Yes", she was angry at his drinking, she said, "he is young, he is intelligent, he is not a stupid street guy, if he could face up to his drinking, that's what I am angry about". When asked about Lauren's removal she said, "I told Lauren not to tell them he had molested her, she would have been perfectly fine if she just closed her mouth". When asked if there was a risk to her children by living with an alcoholic, Bonnie responded that from her experience there was no risk, "it taught my children not to follow in their footsteps". When asked "could you live with somebody who had sexually molested your child," Bonnie responded "just because you kill somebody once, doesn't mean you'd do it again".
Bonnie has lost her daughter Lauren to foster care. She has lost her house in East Hartford to pay legal bills and she faces pending criminal charges and possible incarceration in order to maintain a once a week adult entertainment relationship with a marginally employed alcoholic.
Bonnie has been very mistrustful of DCF. She expresses her mistrust in very derogatory, aggressive and demeaning language. On one occasion she said to one of the case workers who was eight CT Page 9443 months pregnant, "I hope your baby is born dead, I hope your baby is molested. No, I hope your baby is deformed." The social study (Petitioner's Exhibit No. 1) is replete with extremely inappropriate, vulgar language used by Bonnie towards the foster mother, Lauren and DCF. The language is crude and, often, obscene. (See for example, Petitioner's Exhibit 16.) It is quite clear from the testimony and reports of the various evaluators that Bonnie has a great deal of denial and anger regarding her own upbringing and the sexual molestation of her daughter that has not been addressed. Bonnie has no understanding or insight into how her denial has further victimized Lauren. It is equally true that Bonnie continues her relationship with the abuser and by virtue of her having children by the abuser she will continue to have contact with him over the course of the next decade. This relationship is completely incompatible with Lauren's needs and emotional well being.
Bonnie has in the very recent past begun therapy with a clinical psychologist who testified in court. This therapist, in three sessions with Bonnie, seems to have gained a close relationship with her and has achieved remarkable insight into Bonnie's problems. When asked how long it would take for Bonnie to change her way of coping and to have insight into her denial and anger the therapist indicated that to say it would take five years "would be absurd and immoral and to say it would take two months would be unrealistic". The therapist estimated that in six or nine months an assessment could be made to see if change is occurring. The court finds that Lauren can wait no longer.
II. ADJUDICATION
The court having read the verified petition, the social study, the psychological evaluations and reviewed the various documents that have been entered into evidence and further having heard the testimony of the witnesses makes the following findings by clear and convincing evidence:
1. With respect to the respondent Richard R. the amended petition withdraws all grounds for the petition, except the ground of consent. The court finds that a consent has been filed. That the respondent Richard R. was canvassed by the court on August 16, 1996 and determined that the consent was knowingly and voluntarily made with the advice and assistance of competent counsel. The consent to terminate his parental rights is accepted by the court. CT Page 9444
2. With respect to the respondent mother, the court finds that Lauren has been found in a prior proceeding on October 21, 1993 to have been neglected or uncared for. The mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. General Statutes § 17a-112
(c)(3)(B).
The court further finds by clear and convincing evidence that this child has been denied by reasons of act or acts of commission or omission of the mother the care, guidance and control necessary for her physical, educational, moral or emotional well-being in that the respondent mother failed to protect the child from sexual abuse and thereafter failed to cooperate with the police and failed to collaborate with DCF to insure the protection of this minor child. The language of General Statutes §. 17a-112 (c)(3)(C) does not limit the grounds to acts resulting in physical injury only, In re TheresaS., 196 Conn. 18, 25-27, 491 A.2d 355 (1985); In re Sean H.,24 Conn. App. 135, 144, 586 A.2d 1171, cert. denied, 218 Conn. 904,588 A.2d 1078 (1991) but the language may also apply to an act of omission which results in emotional injury to a child. The court finds that the failure of the mother to believe her child when confronted with the child's statements and the perpetrator's admission, thus effectively victimizing the child a second time, constitutes an act proscribed by this section. In re Felicia D.35 Conn. App. 490, 502 (1994).
The court finds that these grounds for termination have existed for more than one year. All other grounds alleged are dismissed without prejudice.
III. DISPOSITION
Pursuant to Sec. 17a-112 (d) the court makes the following factual findings:
1. Appropriate and timely services were provided by DCF including, counseling and visitation co-ordination. The expectations required Bonnie to get individual counseling and sexual abuse victims counseling. While it is true that Bonnie went for individual counseling several years ago she was not self motivated and the counselor did not see her beyond the initial CT Page 9445 interview. She has, on her own in 1997, two months before trial, begun therapy with Dr. Dena Rosenblum. That therapy comes too late to be helpful to the minor child, Lauren who has been in foster care for four years. The court finds that Bonnie did attend sexual abuse victims therapy for a short period of time from which she admits to receiving no benefit. DCF provided counseling service for the minor child with Dr. Farah Ibrahim. DCF further provided visitation services for mother and child when not precluded by court orders.
2. The court, by clear and convincing evidence, finds that DCF made reasonable efforts to reunify the parent by offering counseling services to the mother. She was not motivated to enter individual therapy which was desperately needed. The court finds that the mother was unable or unwilling to benefit from these reunification efforts. Reunification efforts were not possible with respect to the male biological parent.
3. The department with the approval of the court set reasonable and realistic expectations in order to reunify the mother and child. Since the mother was unwilling to deal with her underlying emotional problems she did not meet the expectations of the court. Dr. Robert Means indicated that he did not observe any guilt or shame by the mother. Quite the contrary the mother stated to Dr. Neems that Lauren had made false allegations. That the whole thing was blown way out of proportion and that it was Lauren's fault that she was in foster care. She blames Lauren for being a victim of sexual molestation and that she and Wendy had done things that brought it about. (Petitioner's Exhibit 13) It would hardly be reasonable for the DCF to return a molested child to a mother who maintains a relationship with the abuser and who, with actual knowledge of the sexual contact, refused to believe the child or admit the abuse.
4. With respect to the emotional ties of the child to the foster family, Dr. Neems reported that Lauren can't understand why her mother stayed with the abuser and did not believe her. Dr. Neems stated that Lauren is quite comfortable in her foster home and that her foster parents love her and that she would prefer to be adopted by the present foster parents. He indicates that she has been practicing writing her initials "L.F". She has been in this foster home for four years and needs a sense of certainty about where she is going to grow up.
5. Finding regarding the age of child: The court notes that CT Page 9446 Lauren is now 11 years of age and requires stability of placement and continuity of care. She is of sufficient age and capacity to express an intelligent preference as to placement and she has done this. The child's attorney favors termination and foster placement adoption.
6. Finding regarding the efforts of the parents to adjust their circumstances, conduct or conditions etc.: The court finds that the mother has not made any realistic and sustained efforts in the past four years to deal with her own issues of sexual abuse and lack of early childhood family structure. Giving her additional time may ultimately be helpful to her personally but there is speculation involved in whether individual therapy would produce results quickly enough to be of any benefit to the child. It would not be in the child's best interest to continue indefinitely in foster care.
7. Finding regarding the prevention of the parents having a meaningful relationship: The court finds that nothing done by DCF prevented the mother from maintaining a meaningful relationship with her daughter. Her own election to protect the perpetrator, to maintain her "adult entertainment" relationship, and to discount and minimize the effects of sexual abuse, prevented Bonnie from having a relationship with her daughter. The protective order issued by the criminal court certainly was an impediment to mother maintaining contact with the child but during that whole period of time Bonnie could have been dealing with her own issues so that once visitation was resumed she would have more insight into her own problems as well as into the impact on Lauren of the problems of sexual abuse and her mother's denial of it.
IV. CHILD'S BEST INTEREST
"Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re ValerieD., 223 Conn. 492, 511, 613 A.2d 478 (1992). Here the court has found that grounds exist to terminate the parents rights to the child. The court has also considered the mandatory findings and concludes from the totality of circumstances that termination of parental rights is in Lauren's best interest. This finding is made after considering the childs' sense of time, her need for secure and permanent environment, the relationship Lauren has CT Page 9447 with her foster parents and the totality of circumstances. In Re:Juvenile Appeal, (anonymous) 177 Conn. 648, 667-668,420 A.2d 875 (1979). See generally, J. GOLDSTEIN, A. FREUD AND A. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
V. DISPOSITION
Based upon the a review of the record as a whole, the testimony presented and the exhibits offered into evidence the court having found by clear and convincing evidence that grounds exist to terminate Bonnie's parental rights, and having further found that the father has knowingly and voluntarily consented to the termination of his parental rights and that the grounds have existed as to the mother for a period of time which is greater than one year, and further having concluded that it is in the best interest of the minor child to terminate the parental rights; it is hereby ordered that the parental rights of the biological parents Bonnie S. and Richard R. are hereby terminated. It is further ordered that the Commissioner of DCF is appointed the statutory parent for the purpose of placing the child in adoption. The Commissioner is ordered to report to the court in writing, as to the progress toward that end no later than 90 days from the date of this judgment. If adoption has not been finalized within six months from the date of judgment the Commissioner is further ordered to submit a motion to review the plan for terminated child.
Judgement shall enter accordingly,
FOLEY, J.